MUSKINGUM COUNTY CERTIFIED GRIEVANCE COMMITTEE *v.* GREENBERGER.

[Cite as *Muskingum Cty. Certified Grievance Commt. v. Greenberger,* 108 Ohio St.3d 258, 2006-Ohio-790.]

(No. 2005–1154—Submitted October 12, 2005—Decided March 8, 2006.)

---

Per Curiam.

{¶ 1} Respondent, Bruce L. Greenberger of Mason, Ohio, Attorney Registration No. 0023820, was admitted to the practice of law in Ohio in 1974.

{¶ 2} On April 20, 2004, relator, the Certified Grievance Committee of the Muskingum County Bar Association, charged respondent in a six-count amended complaint with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause, including the parties' stipulations to the charged misconduct, and made findings of fact, conclusions of law, and a recommendation. The board adopted the panel's findings of misconduct but modified the recommended sanction.

## Misconduct

### Count I—Evans

{¶ 3} In August 2002, Louis F. Evans Jr. asked respondent to help him gain custody of his daughter. At that time, Evans was under an Ohio court order to return his daughter to his ex-wife in Florida before the beginning of the school year. Evans, however, was concerned that returning his daughter would place her in an unhealthful environment.

{¶ 4} Respondent advised Evans to keep the girl with him and tried to arrange for her enrollment in Zanesville High School. When her daughter did not return to Florida, however, Evans's ex-wife filed contempt proceedings against him in Ohio. Respondent in turn filed a motion to modify the prior custody order and to designate Evans as the residential parent. The cause was scheduled for hearing on December 17, 2002.

{¶ 5} Respondent did not appear at the December 17 hearing; he instead sent an attorney whom he had recently hired to appear on Evans's behalf. Respondent's client had not expected another attorney to represent him, and he did not think that the other attorney was adequately prepared. On December 31, 2002, Evans was found in contempt and sentenced to 30 days in the Muskingum County jail. His sentence was suspended on the conditions that he restore his daughter to her mother's custody and reimburse his ex-wife $1,354 for expenses.

{¶ 6} The parties stipulated and the board found that in representing Evans, respondent had violated DR 1–102(A)(5) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), 7–101(A)(2) (prohibiting a lawyer from intentionally failing to carry out a contract of professional employment), and 7–106(A) (prohibiting a lawyer from advising a client to disregard the ruling of a tribunal).

### Count II—Steed

{¶ 7} In August 2002, Jack Steed hired respondent to help him modify his court-ordered child-support payments. He paid respondent $400. Steed asked respondent repeatedly about his progress, and respondent assured Steed that he was taking the necessary action on his behalf.

{¶ 8} During relator's investigation, respondent told an investigator that an entry resolving Steed's case had been filed on May 7, 2003. In fact, although respondent had submitted the entry, the court had returned it because the case had been closed and a $10 filing fee was required to reopen it. Respondent eventually obtained the child-support modification that his client sought; however, he did not complete the case until August 11, 2003, one year after he was hired.

{¶ 9} The parties stipulated and the board found that in representing Steed, respondent had violated DR 1–102(A)(5) and 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter).

### Count III—Higgins

{¶ 10} On January 18, 2002, Anna Higgins asked respondent to help probate a will in which she had been named a beneficiary. She was not a statutory heir. In April 2002, after respondent had filed the probate proceeding, several heirs filed a will contest. The court granted summary judgment against respondent's client because he had failed to file a required affidavit with his response to the summary judgment motion.

{¶ 11} Respondent advised Higgins of the ruling and of his intention to file a motion to set the court's order aside. On June 4, 2003, however, Higgins discharged respondent. Higgins retained a new lawyer, who was able to obtain a reversal of the summary judgment and prevail in the will contest. Higgins paid the successor attorney $2,487 for his services.

{¶ 12} While respondent was Higgins's attorney in 2002, Higgins paid him a total of $5,750, although respondent was later unable to produce a written fee agreement. Respondent originally advised relator on March 1, 2004, that he had placed the money in his trust account; however, he later stipulated that he had actually deposited a $5,000 payment into his office operating account. Respondent had also not accounted to Higgins by that date for his services.

{¶ 13} The parties stipulated and the board found that in representing Higgins, respondent had violated DR 9–102(B)(3) (requiring a lawyer to appropriately account to a client for fees), 9–102(B)(4) (requiring a lawyer to promptly return funds to which a client is entitled), and 9–102(A) (requiring a lawyer to keep clients' funds in a separate identifiable account).

### Count IV—Dubosh

{¶ 14} On November 4, 2002, Jennifer Dubosh asked respondent to file for bankruptcy on behalf of her and her husband. Dubosh paid respondent a total of $600 in two installments—$200 on November 4, 2002, and $400 on January 29, 2003. On January 29, 2003, a legal assistant to respondent told Dubosh that

respondent was relocating and that the name of the practice was changing to the Fox Law Office. On March 24, 2003, the legal assistant advised Dubosh that the Fox Law Office would be representing her instead of respondent.

{¶ 15} One month or so later, Dubosh contacted the Fox Law Office and learned that the legal assistant was no longer employed there. Dubosh was also told that she would have to contact respondent for representation. Dubosh did, and respondent advised her that he had just received the file in her case, that he would review it, and that he would consult with her in about a month. In August 2003, having heard nothing from respondent, Dubosh contacted him again. Respondent told her that the bankruptcy filings would be prepared within two weeks. On September 15 and again on October 20, 2003, respondent told Dubosh the same thing.

{¶ 16} On November 23, 2003, Dubosh reported additional debts to respondent and asked him to return her file and fees if he was not going to represent her. On January 9, 2004, after Dubosh filed her grievance with relator, respondent told her that the bankruptcy papers were ready to be signed and were "in the mail." When the papers did not arrive, Dubosh contacted respondent on January 26, 2004, and he told her that he would send the papers to the Fox Law Office to be signed on January 28, 2004. On January 29, 2004, respondent told Dubosh that he would fax the papers for signature on the next day. Finally, on February 2, 2004, after yet another prompt from Dubosh, respondent got the papers to the Fox Law Office. The papers were incomplete.

{¶ 17} On February 3, 2004, Dubosh dismissed respondent, asking him to return her paperwork and fees. Three days later, Dubosh received some papers and a refund check from respondent. The check bounced. Respondent later repaid Dubosh with a money order.

{¶ 18} During the investigation, respondent told relator that he knew as early as September 2003 that the legal assistant who had spoken with Dubosh had stolen some of his clients' files, including Dubosh's. In fact, the employee was eventually indicted for theft from the Fox Law Office.

{¶ 19} The parties stipulated and the board found that in representing Dubosh, respondent had violated DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 7–101(A)(2), 6–101(A)(3), 9–102(B)(3), and 9–102(B)(4).

### Count V—Guenther

{¶ 20} In 2002, Harry O. Guenther asked respondent to file for Chapter 7 bankruptcy on his behalf and paid him a total of $575 for this service. Guenther's daughter later notified respondent that Guenther was ill and could not pursue the bankruptcy at that time. The daughter subsequently contacted respondent at

least 30 times from July 7, 2003, until January 13, 2004, asking for the return of the fees her father had paid. Respondent promised on several of those occasions to return the fees, but he never did. On March 1, 2004, respondent also promised relator that although he had earned a portion of the fee, he would return the entire fee to Guenther within 30 days.

{¶ 21} The parties stipulated and the board found that in representing Guenther, respondent had violated DR 1–102(A)(4), 9–102(B)(3), and 9–102(B)(4).

### Count VI—Tullius

{¶ 22} In November 2002, Susan Tullius paid respondent $700 to stop the Muskingum County Mental Retardation and Developmental Disabilities Board from establishing a guardianship for her and her husband's adult autistic daughter. Respondent directed his new associate to attend a hearing in January 2003 in the Tullius case; however, he did not ensure that the associate was prepared to appear on his clients' behalf. The county agency prevailed in the guardianship proceeding, and the court permitted Tullius and her husband only supervised visitation.

{¶ 23} Respondent's associate apparently filed a motion for visitation with a request for an evaluation in April 2003, but little if anything else happened in the Tullius case after that. Tullius continued to try to communicate with respondent, whom she considered her lawyer, but she had little success. In October 2003, Tullius had become so frustrated that she filed a grievance with relator.

{¶ 24} The parties stipulated and the board found that in representing the Tulliuses, respondent had violated DR 7–101(A)(2).

### Recommended Sanction

{¶ 25} In recommending a sanction for respondent's misconduct, the panel and board considered the mitigating and aggravating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As a mitigating factor, the panel and board found that respondent had been practicing law for over 28 years and had not been the subject of any prior disciplinary proceeding. BCGD Proc.Reg. 10(B)(2)(a). Respondent also expressed remorse for his transgressions, which he attributed to an attempt to expand and then sell his practice. Respondent accepted responsibility for the problems caused by his failure to effectively monitor his staff, and he acknowledged that he had failed to communicate with clients during this time. Respondent also explained at the hearing that he was currently experiencing medical problems that prevented him from working and that he was winding down his practice.

{¶ 26} As aggravating features, the panel and board found that respondent's neglect and other misconduct represented a continuing pattern that adversely affected multiple clients. BCGD Proc.Reg. 10(B)(1)(c). Moreover, respondent had not made complete restitution to some clients, even though he had been paid for work he had not performed. BCGD Proc.Reg. 10(B)(1)(i).

{¶ 27} Respondent did not object to relator's recommendation of a two-year suspension of his license to practice law, with the last year of the suspension stayed on the condition that he repay his clients for all unearned fees and repay Evans for the expenses of his contempt citation. The board found that that condition required respondent to refund $400 in fees and $1,345 in costs to Evans, $400 in fees to Steed, $5,750 in fees to Higgins, $575 in fees to Guenther, and $700 in fees to Tullius.

{¶ 28} The panel accepted the relator's suggested sanction. The board, however, recommended that respondent be suspended from the practice of law for two years with a conditional stay of only the last six months. The board modified the panel's report based on respondent's "indifference and treatment of his clients." Respondent objects to this recommendation and urges us instead to impose the sanction recommended by relator.

## Review

{¶ 29} We agree that respondent violated DR 1–102(A)(4), 1–102(A)(5), 6–101(A)(3), 7–101(A)(2), 7–106(A), 9–102(A), 9–102(B)(3), and 9–102(B)(4), as found by the board. We also agree that a two-year suspension, with the last six months conditionally stayed, is appropriate.

{¶ 30} Respondent did not appear for oral argument as scheduled, and relator advised us that he had made only a small fraction of the restitution that he had promised to pay his clients more than one year ago. Thus, we reject respondent's argument that we should impose a less severe sanction than recommended based on his previously unblemished professional record. We instead tailor the conditions of his sanction to allow specific inquiry at the end of the actual 18–month suspension into his qualifications to return to the practice of law.

{¶ 31} Respondent is therefore suspended from the practice of law in Ohio for two years; however, the last six months of the suspension are stayed, providing that respondent repay $400 in fees and $1,345 in costs to Evans, $400 in fees to Steed, $5,750 in fees to Higgins, $575 in fees to Guenther, and $700 in fees to Tullius, all with interest at the judgment rate. Moreover, to ensure that respondent is not permitted to return to the practice of law prematurely, we impose the further condition that after serving the 18–month actual suspension, respondent must petition for reinstatement pursuant to Gov.Bar R. V(10)(C)

through (G), rather than through the less rigorous procedure for reinstatement set forth in Gov.Bar R. V (10)(A). Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

———————

Stubbins, Watson & Erhard Co., L.P.A., and Brent A. Stubbins; Allen & Baughman and Jan Allen Baughman; and Steven G. Randles, for relator.

Bruce L. Greenberger, pro se.